**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION (CINCINNATI)**

| | | |
|---|---|---|
| Tamara S. Bates, | : | |
| Plaintiff, | : | Case No. 1:18-cv-502 |
| vs. | : | Judge Michael R. Barrett |
| Anthem Insurance Companies, Inc., | : | |
| Defendant. | : | |

<u>**DEFENDANT ANTHEM INSURANCE COMPANIES, INC.'S MOTION FOR**</u>
<u>**SUMMARY JUDGMENT**</u>

Defendant Anthem Insurance Companies, Inc. ("Defendant" or "Anthem") hereby moves this Court, pursuant to Federal Rule of Civil Procedure 56, for an order granting it summary judgment on Plaintiff Tamara Bates' ("Plaintiff" or "Bates") claims. Because there is no genuine dispute of material fact with respect to any of Plaintiff's claims, Anthem is entitled to judgment as a matter of law. A Memorandum in Support of Anthem's Motion is filed herewith.

Dated: October 10, 2019

Respectfully submitted,

*/s/ Jocelyn M. Hoffman*
Natalie M. McLaughlin (#0082203) (Trial Attorney)
Jocelyn M. Hoffman (#0092365)
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216-1008
Telephone: (614) 464-5452
Facsimile: (614) 719-5252
Email: nmmclaughlin@vorys.com;
jmhoffman@vorys.com

*Attorneys for Defendant Anthem Insurance Companies, Inc.*

**MEMORANDUM IN SUPPORT**

## I.     INTRODUCTION

Plaintiff brings claims against her former employer, Anthem, alleging: (1) disability discrimination; (2) wrongful termination in violation of public policy; (3) Family Medical Leave Act ("FMLA") retaliation; and (4) intentional infliction of emotional distress ("IIED").  Plaintiff cannot establish a genuine issue of material fact as to any of these claims.

Plaintiff was terminated for egregious and willful call avoidance, in accordance with Anthem's Call Avoidance policy. That policy mandates termination if a trace report shows an associate engaged in call avoidance, which includes transferring calls back into the telephone queue that an associate is trained to handle.  Anthem received two complaints from Plaintiff's colleagues and one complaint from a provider that Plaintiff was engaging in call avoidance. Trace reports were run to investigate Plaintiff after the complaints were made.  These reports showed that in a period of just two and a half weeks, Plaintiff transferred 26 calls back into the queue which she was able to and should have handled.

Neither Plaintiff's past FMLA leave nor any purported disability had any bearing on Anthem's decision to terminate Plaintiff's employment.  Plaintiff took FMLA leave because of two elective surgeries.   At the time of her termination—months after the second elective surgery—Plaintiff was not suffering from any ongoing limitations stemming from either of the elective surgeries.  The manager who terminated Plaintiff's employment had only met her in person once.  He was not involved in reviewing or approving Plaintiff's FMLA leave, was not provided with any specifics about the reasons for her FMLA leave, was not aware of Plaintiff having any ongoing limitations (as she had none), and did not perceive Plaintiff to be disabled.

1

Therefore, Anthem respectfully requests that this Court grant Anthem's Motion for Summary Judgment, dismissing Plaintiff's claims in their entirety.

## II.    STATEMENT OF FACTS

### A.    Anthem

#### 1.    Utilization Management Representatives and Anthem's Behavioral Health Department

Anthem operates as an insurance company, providing life, dental, vision, disability, and health insurance services across the United States.  To administer its insurance services, Anthem employs Utilization Management Representatives ("UMR") in various departments who are responsible for, among other things: managing incoming calls; determining contract and benefit availability; providing authorization for inpatient admission, outpatient pre-certification, prior authorization, and post-service requests; and referring cases for review for clinicians. (Deposition of Justin Parcell[1] (hereinafter "Parcell Dep.") Ex. B.)  Put simply, UMRs take incoming phone calls and then "build cases," or enter data necessary to authorize care or confirm insurance coverage.  (*See* Deposition of Tamara Bates[2] (hereinafter "Bates Dep.") at 138:3.)

Upon hire, UMRs receive six to eight weeks of on-the-job training to ensure that they are able to access and utilize all of the telephonic and computer software programs necessary to perform their duties and properly direct calls.  (*See* Bates Dep. at 42-46; Parcell Dep. at 53:10-20.)  UMRs also undergo ethics and compliance training.  (Bates Dep. at 45:12-21; Parcell Dep. at 53:10-20.)

UMRs employed in Anthem's Behavioral Health department are responsible for taking three types of incoming calls: member, provider, and crisis.  (*See* Bates Dep. at 56-60; *see also*

---

[1] Relevant portions of Justin Parcell's deposition transcript and the exhibits thereto are attached as Exhibit A.

[2] Relevant portions of Tamara Bates' deposition transcript and the exhibits thereto are attached as Exhibit B.

Parcell Dep. at 34-36.)  Members are individuals who have Anthem insurance coverage, while providers are facilities like hospitals, physicians' offices, and outpatient care centers that provide behavioral health services.  (*See* Bates Dep. at 56:6-10.)  The most critical type of call is a crisis call, which involves an individual having a behavioral health crisis (e.g., threatening harm to others or suicide).  (*See id.* at 57:9-58:12.)  When a UMR receives a crisis call, the call must immediately be directed to an Anthem clinician.  (*See id.* at 58:13, 59:1.)  UMRs cannot determine before they answer a call whether it is a member, provider, or crisis call.  (Parcell Dep. at 34:13-15.)  Obviously, there can be significant consequences if a UMR mishandles a call, which can impact customer service and safety.

### 2. Anthem's Corrective Action and Call Avoidance Policies

Anthem's Corrective Action policy delineates examples of unacceptable conduct that interferes with company operations.  (*See* Bates Dep., Ex. 7 at 2.)  One example of such unacceptable conduct is "intentionally disconnecting a customer/member call, call avoidance, or disrupting customer service."  (*See id.*)  Under this policy, Anthem may terminate an associate at any time, "without following any formal system of corrective action or progressive discipline," if an associate engages in any sort of unacceptable conduct.  (*Id.* at 1.)

Call avoidance is of such concern to Anthem that it maintains a policy solely to explain and address this unacceptable conduct.  (Bates Dep. Ex. 8.)  The policy defines the "failure to appropriately service all calls" as call avoidance, and provides several examples of call avoidance, including transferring calls that the associate is trained to handle back into the telephone queue.  (*Id.*)  Due to the serious impact of call avoidance on the company's ability to service its customers, Anthem's Call Avoidance policy is "zero tolerance."  (*Id.* at 2.)  If it is

determined by detailed review of call trace reports or other monitoring that an associate has been avoiding calls, the associate can be terminated. (*Id.*)

Plaintiff recalls reviewing multiple Anthem policies at the outset of her employment, and was aware of both the Corrective Action and Call Avoidance policies. (*See* Bates Dep. at 63-72.) Plaintiff knew about the consequences for call avoidance. (Bates Dep. at 67:1-24.) Plaintiff was also aware that managers could monitor her calls and call activity. (*Id.* at 81:5-11.)

### B.     Plaintiff's Employment with Anthem

Plaintiff was hired by Anthem in November 2008 as a UMR in the Medical Customer Service department. (*Id.* at 36:10-13, 41:17-22.) Several years into her employment, Plaintiff was promoted to the position of UMR-II and transferred to the Behavioral Health department.[3] (*Id.* at 51-54.) At all times relevant to the claims in this action, Plaintiff worked remotely and was managed by Justin Parcell, Behavioral Health Manager. (*Id.* at 78:3-8.) Plaintiff only ever met Parcell in person once. (*Id.* at 78:9-79:4.)

Anthem's records reflect that Plaintiff took leave on multiple occasions during her employment without issue. (Parcell Dep. Ex. Y.) Specifically, Plaintiff took medical leaves in 2009, 2012, 2014, 2016, and 2017. (*See id.*; *see also* Bates Dep. at 85:18-86:14.) While Plaintiff has no recollection of the circumstances surrounding her various medical leaves, she does recall taking multiple leaves, and testified that the FMLA leave she took in November 2016 and May 2017 are the only two leaves that are at issue here. (Bates Dep. at 85:3-86:14.)

---

[3] When she transitioned to the position of UMR-II in the Behavioral Health department, Bates received additional training on the computer system, and also sat with the Behavioral Health department's Team Lead, Gwendolyn Lazenby, for several weeks to learn how to handle the new content of the calls she would be fielding in the department. (*See* Bates Dep. at 54:5-55:24.)

### 1. Plaintiff's November 2016 and May 2017 FMLA Leaves

In or around November 2016, Plaintiff scheduled one day of paid time off for an elective, outpatient tummy tuck surgery. (*Id.* at 86:15-21, 87:19-24, 88:1-2.) Plaintiff, however, developed an infection after the surgery, resulting in her taking FMLA leave. (*See id.* at 86:22-87:4.) She spent several days in the hospital and after returning home from the hospital, had to take antibiotics for several months, had a home health nurse visit several times a week to assist in packing her wound, and temporarily wore a wound vac. (*Id.* at 89:3-17.)

According to Plaintiff, she informed Parcell that she "wasn't feeling good" and "had a complication" with her surgery, and he contacted Anthem's Human Resources department to inform them that Plaintiff needed to take FMLA leave. (*See id.* at 90:1-10.) Plaintiff testified that she spoke with Parcell and Team Lead Lazenby on several occasions while she was on FMLA leave, but she has no recollection of when those conversations occurred, how many conversations occurred, or the contents of those conversations." (*See id.* at 92:23-99:20.) Plaintiff also testified that she was in contact with Human Resources about her surgery, but she does not recall when those conversations occurred, who she spoke to, or the contents of those conversations. (*See id.* at 100:22-104:16.) Plaintiff returned to work from FMLA leave on a part-time basis in February 2017, and eventually transitioned back to full-time. (*Id.* at 104:24-105:18.)

Plaintiff testified that as a result of her tummy tuck surgery, she has a concave "dip" in her stomach that sometimes opens up after it rubs against clothing. (*Id.* at 148:18-149:8.) When this happens, Plaintiff must keep the area "clean and treat it with a pad." (*Id.* at 149:9-10.) Plaintiff, however, does not take any medication for this stomach wound, and after she cleans

5

and treats the area, she is able to go about her day without any limitations. (*Id.* at 149:13-19.)
Plaintiff has no other ongoing issues as a result of her tummy tuck surgery. (*Id.* at 149:20-22.)

Plaintiff also took FMLA leave in May 2017 for a planned back surgery. (*Id.* at 110:1-
14.) Prior to taking leave for back surgery, Plaintiff worked a reduced schedule and different
hours to accommodate physical therapy appointments and cortisone shots for her back. (*Id.* at
112:23-113:6.) Plaintiff recalls that Parcell accommodated her without issue. (*Id.* at 112:23-
114:17.) Though Plaintiff believes she informed Parcell she was going to have back surgery, she
does not recall having any other communications with Parcell about the back surgery. (*See id.* at
115:24.) Plaintiff has had no ongoing complications or limitations as a result of her back surgery.
(*Id.* at 149:23-150:7.)

### 2. Anthem's Investigation of Plaintiff's Call Avoidance and Plaintiff's Termination

In July 2017, Parcell received complaints from multiple sources about Plaintiff engaging
in call avoidance. First, two other Behavioral Health UMRs complained to Parcell about
Plaintiff transferring calls back into the queue that she was able to handle. (*See* Parcell Dep. at
109:16-110:1.) Several days later, Parcell received a voicemail from a provider on July 13,
2017, who complained that she had called for treatment authorization, was placed on hold by
Plaintiff for twenty minutes, and then the call was disconnected without resolution. (*See* Parcell
Dep. Ex. U at 1.) Parcell contacted Anthem's Human Resources department on July 13, 2017,
by submitting a ticket via Anthem's intranet. (*See id.*; *see also* Parcell Dep. at 110:12-111:4;
Deposition of Andria Bryan[4] (hereinafter "Bryan Dep") at 19:22-20:5.) The ticket summarized
the complaints directed to Parcell, and attached the coworker's complaints and provider's
complaint. (*See* Parcell Dep. Ex. U at 1.)

---

[4] Relevant portions of Andria Bryan's deposition transcript are attached hereto as Exhibit C.

Parcell's ticket was randomly assigned to Andria Bryan, a member of Anthem's Human Resources department. (Declaration of Andria Bryan[5] (hereinafter "Bryan Decl.") at ¶ 1.) Parcell investigated the complaints of Plaintiff's call avoidance, and communicated with Bryan throughout the investigation. (*See* Bryan Dep. at 27:4-30:3.)

First, Parcell confirmed with Team Lead Lazenby that Plaintiff was not having technological issues that would explain the transfer of calls back into the queue. (Parcell Dep. at 112:14-20, 124:18-125:5; Exs. U, V.) Parcell also reviewed trace reports of both Plaintiff and other Behavioral Health UMRs to confirm that Plaintiff was indeed transferring calls back to the queue. (*See* Parcell Dep. at 124-33; Parcell Dep. Exs. W, X.) By comparing Plaintiff's trace reports with those of other UMRs, the trace reports confirmed that the calls that Plaintiff transferred back into the queue were ultimately handled by other UMRs, who then built cases from the calls. (*See* Parcell Dep. at 131:8-23, 132:11-15.) In two and a half weeks, she transferred 26 calls to the queue that her fellow UMRs then handled. (*See* Parcell Dep. Exs. W, X.) Many of these transfers Plaintiff did before or after breaks or close to the end of her shift. (*See* Parcell Dep. Ex. W.) This suggests transfers were done to extend her breaks or end her work early. Parcell communicated his findings from the trace reports to Bryan. (Bryan Dep. at 29:19-30:12; Parcell Dep. Ex. W.) Based on the results of the investigation, which showed Plaintiff willfully returning calls to the queue to avoid handling them, Parcell recommended terminating Plaintiff's employment, and Bryan supported Parcell's recommendation. (Bryan Dep. at 45:22-46:1.)[6]

---

[5] The Declaration of Andria Bryan is attached as Exhibit D.

[6] Bryan never met Plaintiff in person, and had no knowledge of who Plaintiff was prior to getting involved in the July 2017 investigation. (*See* Bryan Dep. at 10:10-24, 12:21-23, 16:15-24.)

Plaintiff's employment with Anthem was terminated on July 21, 2017. (Bryan Dep. at 46:1-7.) Plaintiff was terminated for her egregious violation of Anthem's Call Avoidance policy. (Bryan Dep. at 42:3-14; Parcell Dep. at 70:2-9.) During the termination phone call with Parcell and Bryan, Plaintiff did not deny transferring calls to the queue. (Bryan Dep. at 46:2-12; Parcell Dep. at 118:8-11.)

## III.    LAW AND ARGUMENT

### A.    Legal Standard

Summary judgment must be granted where there remain no genuine issues as to any material fact, the moving party is entitled to judgment as a matter of law, and it appears from the evidence that reasonable minds can come to but one conclusion that is adverse to the non-moving party. *Burchett v. Kiefer*, 310 F.3d 937, 941 (6th Cir. 2002); *Hopson v. DaimlerChrysler Corp*. 306 F.3d 427, 432 (6th Cir. 2002). Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

At the summary judgment phase, facts must be viewed in the light most favorable to the nonmoving party ***only*** if there is a genuine dispute as to those facts. *Scott v. Harris*, 550 U.S. 372 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-87 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original).

8

**B.** **Anthem Is Entitled to Summary Judgment on Plaintiff's Disability Discrimination Claim.**

Plaintiff alleges that Anthem discriminated against her on the basis of disability (or perceived disability) in violation of both the ADA and Ohio law.[7]  (Compl. at 6-7.)  There is no direct evidence of discrimination.

In the absence of direct evidence, disability discrimination claims under the ADA are subject to the familiar *McDonnell Douglas* burden-shifting framework.  First, Plaintiff must establish a *prima facie* case of discrimination, or that: (1) she was "disabled" within the meaning of the ADA; (2) she was otherwise qualified to perform the essential functions of her job; (3) she suffered an adverse employment action; and (4) a non-disabled person replaced her.  *Martin v. Barnesville Exempted Vill. Sch. Dist. Bd. of Educ.*, 209 F.3d 931, 934 (6th Cir. 2000) (citation omitted).  Once a *prima facie* case has been established, the burden shifts to Anthem to "articulate a legitimate, nondiscriminatory reason for the adverse employment action."  *Id.* Finally, the burden shifts back to Plaintiff to demonstrate that Anthem's stated reason for her termination is a pretext for unlawful discrimination.  *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  Plaintiff cannot establish a *prima facie* case of disability discrimination, or show that Anthem's basis for termination was pretextual, and therefore, summary judgment is warranted.

---

[7] Because Ohio courts look to the ADA for guidance in interpreting Ohio Revised Code Section 4112.02(A), Plaintiff's state and federal disability discrimination claims will be analyzed simultaneously, using federal standards. *See Dillbeck v. Huntington Nat'l Bank*, No. 2:03-cv-0689, 2005 U.S. Dist. LEXIS 10273, at *15 (S.D. Ohio May 26, 2005); *City of Columbus Civil Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 206-07 (Ohio 1998).

1. **Plaintiff Cannot Establish a *Prima Facie* Case of Disability Discrimination.**

Plaintiff's disability discrimination claim fails because she cannot establish that she was disabled or that Anthem perceived her to be disabled, and she was not replaced by a non-disabled person.

First, Plaintiff cannot establish that she was disabled or that Anthem perceived her to be disabled. Both of Plaintiff's alleged disabilities were scheduled, elective surgeries: a tummy tuck and back surgery. (Bates Dep. at. 152:14-16.) Multiple federal courts have held that temporary conditions resulting from elective surgeries are not disabilities. In *Lee v. Spectranetics Corp.*, the plaintiff suffered a left shoulder labral tear, which was repairable through arthroscopic surgery. No. 12-cv-00633, 2013 U.S. Dist. LEXIS 139232, at *3-4 (D. Colo. Sept. 27, 2013) (granting summary judgment on ADA disability discrimination claim). The surgery was "entirely elective and did not need to occur on any particular date or within any particular timeframe." *Id.* at *4. After surgery, the plaintiff experienced "loss of strength, weakness, and impaired range of motion in his shoulder," but was able to return to work following surgery and perform the essential functions of his job without accommodation. *Id.* at *5-6. Five days after returning from surgery, the plaintiff was terminated. *Id.* at *6.

In holding that the plaintiff was not disabled within the meaning of the ADA, the *Lee* court noted that the plaintiff's post-surgical symptoms did not substantially limit his ability to work. *Id.* at *8. Moreover, the court found that the plaintiff failed to provide "sufficient evidence that his shoulder impairment "was both long-term and severe at the time that he was fired." *Id.* at *11. Citing the following language from the U.S. District Court for Eastern District of Pennsylvania, the *Lee* court noted:

> [T]he ADAAA was adopted to specifically address certain impairments

10

> that were not receiving the protection that Congress intended—cancer,
> HIV-AIDS, epilepsy, diabetes, multiple sclerosis, amputated and
> partially amputated limbs, post-traumatic stress disorder, intellectual and
> developmental disabilities—***not minor, transitory impairments***, except
> if of such a severe nature that one could not avoid considering them
> disabilities . . .

*Id.* at *11-12 (citing *Koller v. Riley Riper Hollin & Colagreco*, 850 F. Supp. 2d 502, 513 (E.D. Pa. 2012)).  As a result, the court held that a "temporary condition post-surgery does not qualify as a disability."  *Id.* at *13 (citing *Rhodes v. Langston Univ.*, 462 F. App'x 773, 779 (10th Cir. 2011)).

In *Acosta v. Hilton Grand Vacations Co.*, a plaintiff claimed she was "regarded as" disabled by her employer because she had breast reduction surgery.  C.A. No. 4:15-495, 2017 U.S. Dist. LEXIS 49494 (D.S.C. Jan. 23, 2017), *R&R adopted by* 2017 U.S. Dist. LEXIS 47359 (D.S.C. Mar. 30, 2017).  The *Acosta* court found that the plaintiff was not a qualified individual with a disability because the breast reduction surgery was not "necessitated by a medical impairment."  *Id.* at *62-63; *see also Roberts v. Onslow Cty. Bd. of Educ.*, No. 7:13-cv-39, 2014 U.S. Dist. LEXIS 157859, at *16 (E.D.N.C. Aug. 28, 2014) (finding no disability when procedure was not medically necessary and no substantial limitations post-surgery).  Further, the court found that plaintiff provided no evidence that her employer perceived her to have an ***impairment*** from the surgery.  *See id.* at *63.

Similarly, here, Plaintiff is not disabled within the meaning of the ADA.  With regard to Plaintiff's tummy tuck, the surgery was elective and had no medical necessity.  (*See* Bates Dep. at 86:15-21, 87:19-24, 88:1-2.)  And while Plaintiff contracted an infection from the procedure, after taking antibiotics and having her surgical wound treated, she returned to work without restriction approximately three months after the surgery.  (*See id.* at 104:24-105:18.)  In addition, Plaintiff suffers no long-term limitations as a result of the surgery or post-surgical infection.

11

(*See id.* at 149:8-22.)   As for Plaintiff's elective back surgery, she concedes that she had no issues or limitations after having the surgery.  (*Id.* at 149:23-150:7.)  It is undisputed that, at the time of Plaintiff's termination, she had no limitations and therefore, was not disabled.

Nor has Plaintiff provided evidence that Parcell perceived her as having an impairment as a result of having two elective surgeries, from which she had completely recovered at the time of her termination.  Plaintiff claims that she informed Parcell about not feeling well and having a "complication" from her first surgery and believes she told Parcell her second surgery was a back surgery, but she does not recall any other information she provided to Parcell following either surgery (and nothing would refresh her recollection on this).  (*See id.* at 90:1-10, 92:23-99:20, 100:22-104:16, 115:8-117:14.)  Parcell did not talk to Plaintiff about the reasons she was taking FMLA leave, was not informed by anyone else at Anthem about the basis for Plaintiff's leave, never saw any of Plaintiff's medical paperwork, and was not involved in reviewing the FMLA request or certification.  (*See* Parcell Dep. at 24:22-25, 49:15-17, 137-46.)  At the time of Plaintiff's termination, Parcell was not aware of Plaintiff having any limitations from her prior surgeries and did not perceive Plaintiff to have any limitations.  (*See id.* at 137-46.)

Second, Plaintiff cannot show that she was replaced by a non-disabled individual.  In fact, no one was hired to fill Plaintiff's position after her termination.  (*See id.* at 21:23-23:24.)  Subsequently, in October 2017, the team was restructured to combine areas.  (*See id.*)

For these reasons, Plaintiff cannot establish a *prima facie* case of disability discrimination and therefore, Anthem is entitled to summary judgment on Plaintiff's disability discrimination claims under federal and state law.

**2.  Anthem Has Shown that Plaintiff Was Terminated for Violating Anthem's Call Avoidance Policy, Which Is a Legitimate Non-Discriminatory Reason.**

Even if Plaintiff could state a *prima facie* case of disability discrimination, Anthem has articulated a legitimate, nondiscriminatory reason for Plaintiff's termination—her egregious violation of the company's zero-tolerance Call Avoidance policy.  (Parcell Dep. at 70:2-6; Bryan Dep. at 34:2-4.)  Specifically, Anthem's investigation showed that she willfully returned calls to the queue that she knew how to handle, and she frequently did this before or after breaks, or close to the end of her shift.  (*See* Parcell Dep. Exs. U, V, W, X.)  The Sixth Circuit Court of Appeals and this Court have found that violation of company policy is a legitimate, nondiscriminatory reason for termination.  *See, e.g.*, *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 558 (6th Cir. 2009) (affirming summary judgment for employer where articulated reason for termination was employee's violation of code of conduct); *Green v. Schaeffer's Investment Research, Inc.*, No. 1:09-cv-360, 2012 U.S. Dist. LEXIS 26136, at *26 (S.D. Ohio Feb. 29, 2012) (granting summary judgment to employer where articulated reason for termination was violation of e-mail and confidentiality policies).

**3.  Plaintiff Cannot Demonstrate Pretext.**

Finally, Plaintiff cannot demonstrate that Anthem's articulated reason for her termination is pretextual.  An employee can show that an employer's purported reason for termination is pretextual if it: (1) had no basis in fact; (2) did not actually motivate the employer's action; or (3) was insufficient to motivate the employer's action. *Travers v. Cellco P'ship*, 579 F. App'x 409, 416 (6th Cir. 2014) (internal citations omitted).

First, Plaintiff cannot show Anthem's reason for termination had no basis in fact.  While Plaintiff may disagree with Anthem's decision to terminate her employment, "disputes about the

interpretation of company policy do not typically create genuine issues of material fact regarding whether a company's stated reason for an adverse employment action is only a pretext designed to mask unlawful discrimination." *Sybrandt*, 560 F.3d at 558-59. Indeed, as long as an employer honestly believes in its nondiscriminatory reason for discharge, an employee cannot establish pretext, even if the ultimate reason is incorrect. *Id.* at 559 (quoting *Majewski v. Auto. Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)). "The key inquiry in assessing whether an employer holds such an honest belief is whether the employer made a reasonably informed and considered decision before taking the complained-of action." *Id.* (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598-99 (6th Cir. 2007)).

Here, Anthem made a reasonably informed and considered decision, which was supported by evidence from a thorough investigation. (*See* Parcell Dep. at 124-33, Exs. U, V, W, X.) The investigation was conducted due to several complaints made about Plaintiff in July 2017 from other UMRs, who had to handle calls that Plaintiff transferred back into the queue, and from a provider who was placed on hold and then disconnected by Plaintiff without resolution. (*See* Parcell Dep. at 109:16-110:1, Ex. U at 1.) Trace reports of Plaintiff's call handling confirmed that between July 1st through 18th, Plaintiff transferred calls that she should have handled back into the queue 26 times, and those calls were then handled by other UMRs after transfer. (*See* Parcell Dep. at 124-33; Parcell Dep. Exs. W, X; 131:8-23, 132:11-15.) From this investigation, which includes trace reports that show Plaintiff willfully transferring calls that she should have handled (and often near break times and near the end of her shift), it was entirely reasonable for Parcell to conclude that Plaintiff egregiously violated the Call Avoidance policy. Plaintiff has not offered any evidence to rebut these trace reports, nor could she.

Second, Plaintiff cannot show that Anthem's determination that she engaged in call avoidance did not actually motivate Anthem's decision to terminate.  Under this second method, the court, "presumes the factual basis of the purported reason is true and that such ground could motivate dismissal."  *Travers*, 579 F. App'x at 417 (internal citations omitted).  Plaintiff must then attack the explanation "by showing circumstances which tend to prove an illegal motivation was *more* likely than that offered by the defendant."  *Id.* (emphasis in original).  Though Plaintiff may claim that she believes she was terminated unfairly, she offers no evidence that an illegal motivation was more likely the reason she was terminated. An employee's "personal beliefs, conjecture, and speculation" are insufficient to support a motion for summary judgment.  *Snyder v. Pierre's French Ice Cream Co.*, 589 F. App'x 767, 771 (6th Cir. 2014).  At the time of her termination, Plaintiff suffered from no limitations and therefore was not disabled.  There is also no evidence that Parcells, who had extremely limited information about Plaintiff's past surgeries, considered Plaintiff to be disabled or bore any animosity toward Plaintiff for her past medical issues.

Third, Plaintiff cannot show that call avoidance was insufficient to motivate Anthem's termination decision.  Anthem's Call Avoidance policy states as follows: (1) transferring calls that an associate is trained to handle back into the queue is call avoidance; (2) Anthem has a zero tolerance policy on call avoidance; and (3) if review of call trace reports or other monitoring show that an associate has been avoiding calls, the associate will be terminated. (Bates Dep. Ex. 8.)  Therefore, termination was plainly in accordance with Anthem's policy on Call Avoidance. There is no evidence that any other associate engaged in similar call avoidance and was not terminated. Thus, even if Plaintiff could establish a *prima facie* case of disability discrimination, Anthem has articulated a legitimate, nondiscriminatory reason for Plaintiff's termination, and

15

Plaintiff cannot show that this reason was a pretext for unlawful disability discrimination. For these additional reasons, Anthem is entitled to summary judgment on Plaintiff's disability discrimination claims under federal and state law.

**C.    Anthem Is Entitled to Summary Judgment on Plaintiff's Wrongful Termination Claim.**

Plaintiff also brings a state law tort claim for wrongful termination in violation of public policy based on Anthem's alleged violation of the ADA and/or Ohio Revised Code Section 4112.02. (Compl. at 8.) This claim fails as a matter of law, however, as the Supreme Court of Ohio has held that there is "no need to recognize a common law action for wrongful discharge if there already exists a statutory remedy that adequately protects society's interests." *Slane v. MetaMateria Partners, LLC*, 892 N.E.2d 498, 504 (Ohio Ct. App. 2008) (citing *Leininger v. Pioneer Nat'l Latex*, 875 N.E.2d 36 (Ohio 2007)) (affirming summary judgment on claim for wrongful termination in violation of public policy against disability discrimination); *see also Kellogg v. Ohio State Univ.*, 2011-Ohio-4848, at ¶ 19.

Because both federal and state statutes prohibiting disability discrimination exist and are adequate to protect societal interests, Plaintiff's wrongful termination claim fails. The claim also fails for the additional, independent reason that Plaintiff cannot establish that she is disabled. *Slane*, 892 N.E.2d at 504; *see supra* Section III.B.1. Anthem is therefore entitled to summary judgment on Plaintiff's wrongful termination claim.

**D.    Anthem Is Entitled to Summary Judgment on Plaintiff's FMLA Retaliation Claim.**

As with Plaintiff's disability discrimination claim, her claim for FMLA retaliation based on indirect evidence is subject to *McDonnell Douglas* burden shifting. To establish a *prima facie* case of FMLA retaliation, Plaintiff must show: (1) she availed herself of a protected right under

the FMLA; (2) she suffered an adverse employment action; and (3) there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action. *Marshall v. Rawlings Co., LLC*, 854 F.3d 368, 381 (6th Cir. 2017). If Plaintiff can make such a showing, the burden shifts back to Anthem to articulate a legitimate, nonretaliatory reason for the adverse employment action. *Id.* at 382. Then, Plaintiff must show that Anthem's stated reason is pretextual. *See id.*

Plaintiff's FMLA retaliation claim fails because she cannot establish a *prima face* case. Specifically, she cannot show any causal connection between the exercise of her FMLA rights and her termination. Parcell did not talk to Plaintiff about the reasons she was taking FMLA leave, was not informed by anyone else at Anthem about the basis for Plaintiff's leave, never saw any of Plaintiff's medical paperwork, and was not involved in reviewing the FMLA request or certification. (*See* Parcell Dep. at 24:22-25, 49:15-17, 137-46.) Plaintiff offers no evidence that simply knowing Plaintiff took FMLA leave motivated the decision to terminate her employment.

Furthermore, even if Plaintiff could establish a *prima facie* case, her FMLA claim fails for the same reason her disability discrimination claim fails. Anthem has shown Plaintiff was terminated for violating Anthem's Call Avoidance policy. *See supra* Section III.B.2. And Plaintiff has failed to show that the decision to terminate was a pretext for FMLA retaliation. *See supra* Section III.B.3. Accordingly, Anthem is entitled to summary judgment on Plaintiff's FMLA retaliation claim.

### E.    Anthem Is Entitled to Summary Judgment on Plaintiff's IIED Claim.

Finally, Plaintiff brings a claim for IIED against Anthem. To prevail on this claim, Plaintiff must show that: (1) Anthem intended to cause emotional distress, or knew or should have known that actions taken would result in serious emotional distress; (2) Anthem's conduct

was extreme and outrageous; (3) Anthem's actions proximately caused Plaintiff's psychic injury; and (4) the mental anguish Plaintiff suffered was serious. *Hanly v. Riverside Methodist Hosp.*, 603 N.E.2d 1126, 1132 (Ohio Ct. App. 1991).

Plaintiff has not testified to ***any*** conduct on Anthem's part that occurred outside the confines of a typical employment relationship. Plaintiff has pointed to no action taken by Anthem to support her IIED claim other than the termination of her employment. The "act of terminating employment falls short of the extreme or outrageous conduct necessary" to support an IIED claim. *Wissler v. Ohio Dep't of Job & Family Servs.*, 2009-Ohio-2826, at ¶ 38. "Adverse employment actions, without more, do not meet this standard." *Id.* (citing *Katterhenrich v. Fed. Hocking Local Sch. Dist. Bd. of Educ.*, 700 N.E.2d 626 (Ohio Ct. App. 1997)). Accordingly, Anthem is entitled to summary judgment on Plaintiff's IIED claim.

## IV.    CONCLUSION

For all of the foregoing reasons, Anthem respectfully requests that this Court grant Anthem's Motion for Summary Judgment in its entirety.

Dated: October 10, 2019                          Respectfully submitted,

*/s/ Jocelyn M. Hoffman*
Natalie M. McLaughlin (#0082203) (Trial Attorney)
Jocelyn M. Hoffman (#0092365)
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216-1008
Telephone: (614) 464-5452
Facsimile: (614) 719-5252
Email: nmmclaughlin@vorys.com;
jmhoffman@vorys.com

*Attorneys for Defendant Anthem Insurance Companies, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on October 10, 2019, the foregoing was filed with the Court and served via the Court's electronic filing system.

*/s/ Jocelyn M. Hoffman*
Jocelyn M. Hoffman

19