IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI

| | | |
|---|---|---|
| TAMARA S. BATES, | : | Case No. 1:18-cv-502 |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| ANTHEM INSURANCE COMPANIES, INC., | : | |
| | : | |
| | : | |
| Defendant. | : | |

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT (DOC. 16)**

This case is before the Court on the Motion for Summary Judgment (Doc. 16) filed by Defendant Anthem Insurance Companies, Inc. ("Anthem"). Plaintiff Tamara Bates alleges that Anthem, her former employer, is liable for (1) disability discrimination; (2) wrongful termination in violation of public policy; (3) retaliation in violation of the Family and Medical Leave Act ("FMLA"); and (4) intentional infliction of emotional distress. Anthem argues that it should be granted summary judgment on Bates's claims because she has not come forward with evidence creating a genuine issue of material fact as to her entitlement to relief. Bates filed a memorandum in opposition to Anthem's Motion, in response to which Anthem filed a reply. (Docs. 18, 19.) This matter is therefore fully briefed and ripe for review. As discussed below, the Court agrees that there are no genuine issues of material fact precluding judgment in Anthem's favor. Accordingly, its Motion for Summary Judgment is **GRANTED**.

**FACTS**

Anthem is an insurance company providing life, dental, vision, disability, and health insurance services across the United States.  To administer its insurance services, Anthem employs Utilization Management Representatives ("UMR") in various departments who are responsible for, among other things: managing incoming calls; determining contract and benefit availability; providing authorization for inpatient admission, outpatient pre-certification, prior authorization, and post-service requests; and referring cases for review for clinicians.  (Doc. 16-1.)  Put simply, UMRs take incoming phone calls and then "build cases," or enter data necessary to authorize care or confirm insurance coverage.  (*See* Doc. 16-2 at 138:3.)  Upon hire, UMRs receive six to eight weeks of on-the-job training to ensure that they are able to access and utilize all of the telephonic and computer software programs necessary to perform their duties and properly direct calls.  (*See* Doc. 16-2 at 42-46; Doc. 16-1 at 53:10-20.)  UMRs also undergo ethics and compliance training.  (Doc. 16-2 at 45:12-21; Doc. 16-1 at 53:10-20.)  UMRs employed in Anthem's Behavioral Health department are responsible for taking three types of incoming calls: member, provider, and crisis.  (*See* Doc. 16-2 at 56-60; *see also* Doc. 16-1 at 34-36.)

Members are individuals who have Anthem insurance coverage, while providers are facilities like hospitals, physicians' offices, and outpatient care centers that provide behavioral health services.  (*See* Doc. 16-2 at 56:6-10.)  The most critical type of call is a crisis call, which involves an individual having a behavioral health crisis (e.g., threatening harm to others or suicide).  (*See id*. at 57:9-58:12.)  When a UMR receives a

2

crisis call, the call must immediately be directed to an Anthem clinician. (*See id*. at 58:13, 59:1.) UMRs cannot determine before they answer a call whether it is a member, provider, or crisis call. (Doc. 16-1 at 34:13-15.)

Anthem's Corrective Action policy delineates examples of unacceptable conduct that interferes with company operations. (*See* Doc. 16-2, Ex. 7 at 2.) One example of unacceptable conduct is "intentionally disconnecting a customer/member call, call avoidance, or disrupting customer service." (*See id*.) Under this policy, Anthem may terminate an associate at any time, "without following any formal system of corrective action or progressive discipline," if an associate engages in any sort of unacceptable conduct. (*Id*. at 1.)

Anthem maintains a specific policy to explain and address call avoidance. (Doc. 16-2, Ex. 8.) The policy defines the "failure to appropriately service all calls" as call avoidance, and provides several examples of call avoidance, including transferring calls that the associate is trained to handle back into the telephone queue. (*Id*.) Due to the serious impact of call avoidance on the company's ability to service its customers, Anthem's call avoidance policy is "zero tolerance." (*Id*. at 2.) If it is determined by detailed review of call trace reports or other monitoring that an associate has been avoiding calls, the associate can be terminated. (*Id*.) Bates recalls reviewing multiple Anthem policies at the outset of her employment and was aware of both the Corrective Action and call avoidance policies. (*See* Doc. 16-2 at 63-72.) Bates knew about the consequences for call avoidance. (Doc. 16-2 at 67:1-24.) Bates was also aware that managers could monitor her calls and call activity. (*Id*. at 81:5-11.)

Bates was hired by Anthem in November 2008 as a UMR in the Medical Customer Service department. (*Id*. at 36:10-13, 41:17-22.) Several years into her employment, Bates was promoted to the position of UMR-II and transferred to the Behavioral Health department. (*Id*. at 51-54.) At all times relevant to the claims in this action, Bates worked remotely and was managed by Justin Parcell, Behavioral Health Manager. (*Id*. at 78:3-8.) Bates only ever met Parcell in person once. (*Id*. at 78:9-79:4.) Anthem's records reflect that Bates took leave on multiple occasions during her employment without issue. (Doc. 16-1 Ex. Y.) Specifically, Bates took medical leaves in 2009, 2012, 2014, 2016, and 2017. (*See id*.; *see also* Doc. 16-2 at 85:18-86:14.) While Bates has no recollection of the circumstances surrounding her various medical leaves, she does recall taking multiple leaves, and testified that the FMLA leave she took in November 2016 and May 2017 are the only two leaves at issue in this case. (Doc. 16-2 at 85:3-86:14.)

In November 2016, Bates scheduled one day of paid time off for an elective, outpatient tummy tuck surgery. (*Id*. at 86:15-21, 87:19-24, 88:1-2.) Bates, however, developed an infection after the surgery, resulting in her taking FMLA leave. (*See id*. at 86:22-87:4.) She spent several days in the hospital and after returning home from the hospital, had to take antibiotics for several months, had a home health nurse visit several times a week to assist in packing her wound, and temporarily wore a wound vac. (*Id*. at 89:3-17.) According to Bates, she informed Parcell that she "wasn't feeling good" and "had a complication" with her surgery, and he contacted Anthem's Human Resources department to inform them that Bates needed to take FMLA leave. (*See id*. at

4

90:1-10.) Bates asserts that Parcell initially disapproved of her request to work half days, but she cites a portion of Parcell's deposition that has not been filed in the Court's docket. (*See* Doc. 18 at 2, citing Justin Parcell Deposition at 148-149.)

Bates testified that she spoke with Parcell and Team Lead Lazenby on several occasions while she was on FMLA leave, but she has no recollection of when those conversations occurred, how many conversations occurred, or the contents of those conversations." (*See id*. at 92:23-99:20.) Bates also testified that she was in contact with Human Resources about her surgery, but she does not recall when those conversations occurred, who she spoke to, or the contents of those conversations. (*See id*. at 100:22-104:16.) Bates returned to work from FMLA leave on a part-time basis in February 2017, and eventually transitioned back to full-time. (*Id*. at 104:24-105:18.)

Bates testified that as a result of her tummy tuck surgery, she has a concave "dip" in her stomach that sometimes opens up after it rubs against clothing. (*Id*. at 148:18-149:8.) When this happens, Bates must keep the area "clean and treat it with a pad." (*Id*. at 149:9-10.) Bates, however, does not take any medication for this stomach wound, and after she cleans and treats the area, she is able to go about her day without any limitations. (*Id*. at 149:13-19.) Bates has no other ongoing issues as a result of her tummy tuck surgery. (*Id*. at 149:20-22.)

Bates also took FMLA leave in May 2017 for a planned back surgery. (*Id*. at 110:1-14.) Prior to taking leave for back surgery, Bates worked a reduced schedule and different hours to accommodate physical therapy appointments and cortisone shots for her back. (*Id*. at 112:23-113:6.) Bates recalls that Parcell accommodated her without

issue. (*Id*. at 112:23-114:17.) Though Bates believes she informed Parcell she was going to have back surgery, she does not recall having any other communications with Parcell about the back surgery. (*See id*.at 115:24.) Bates has had no ongoing complications or limitations as a result of her back surgery. (*Id*.at 149:23-150:7.)

In July 2017, Parcell received complaints from multiple sources about Bates engaging in call avoidance. First, two other Behavioral Health UMRs complained to Parcell about Bates transferring calls back into the queue that she was able to handle. (*See* Doc. 16-1 at 109:16-110:1.) Several days later, Parcell received a voicemail from a provider on July 13, 2017, who complained that she had called for treatment authorization, was placed on hold by Bates for twenty minutes, and then the call was disconnected without resolution. (*See* Doc. 16-1 Ex. U at 1.) Parcell contacted Anthem's Human Resources department on July 13, 2017, by submitting a ticket via Anthem's intranet. (*See id*.; *see also* Doc. 16-1 at 110:12-111:4; Doc. 16-3 at 19:22-20:5.) The ticket summarized the complaints directed to Parcell and attached the coworker's complaints and provider's complaint. (*See* Doc. 16-1 Ex. U at 1.)

Parcell's ticket was randomly assigned to Andria Bryan, a member of Anthem's Human Resources department. (Doc. 16-4 at ¶ 1.) Parcell investigated the complaints of Bates's call avoidance and communicated with Bryan throughout the investigation. (*See* Doc. 16-3 at 27:4-30:3.) First, Parcell confirmed with Team Lead Lazenby that Bates was not having technological issues that would explain the transfer of calls back into the queue. (Doc. 16-1 at 112:14-20, 124:18-125:5; Exs. U, V.) Parcell also reviewed trace reports of both Bates and other Behavioral Health UMRs to confirm that Bates was

6

indeed transferring calls back to the queue.  (*See* Doc. 16-1 at 124-33; Doc. 16-1 Exs. W, X.)  By comparing Bates's trace reports with those of other UMRs, the trace reports confirmed that the calls that Bates transferred back into the queue were ultimately handled by other UMRs, who then built cases from the calls.  (*See* Doc. 16-1 at 131:8-23, 132:11-15.)  In two and a half weeks, she transferred 26 calls to the queue that her fellow UMRs then handled.  (*See* Doc. 16-1 Exs. W, X.)  Many of these transfers Bates did before or after breaks or close to the end of her shift.  (*See* Doc. 16-1 Ex. W.)  This suggested to Anthem that the transfers were done to extend her breaks or end her work early.  Parcell communicated his findings from the trace reports to Bryan.  (Doc. 16-3 at 29:19-30:12; Doc. 16-1 Ex. W.)  Based on the results of the investigation, which showed Bates willfully returning calls to the queue to avoid handling them, Parcell recommended terminating Bates's employment, and Bryan supported Parcell's recommendation.  (Doc. 16-3 at 45:22-46:1.)

Bates's employment with Anthem was terminated on July 21, 2017.  (Doc. 16-3 at 46:1-7.)  Anthem asserts that Bates was terminated for only due to her violation of Anthem's call avoidance policy.  (Doc. 16-3 at 42:3-14; Doc. 16-1 at 70:2-9.)  During the termination phone call with Parcell and Bryan, Bates did not deny transferring calls to the queue.  (Doc. 16-3 at 46:2-12; Doc. 16-1 at 118:8-11.)

Bates denies that she violated Anthem's call avoidance policy.  She claims that she was attempting to transfer calls to customer service, but inadvertently transferred the calls back into the queue because Anthem provided her an incorrect list of phone numbers.  (Doc. 18 at 3, citing Doc. 16-1 at 130:4-13.)

## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present

some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affirmations are more credible. 10A *Wright & Miller, Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the factfinder. *Id*. However, the mere existence of a scintilla of evidence in support of the nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id*. The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Id*.

In ruling on a motion for summary judgment, "[a] district court is not … obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), cert. denied, 494 U.S. 1091 (1990). Thus, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed. R. Civ. P. 56(c).

**ANALYSIS**

As mentioned, Bates brings four claims in this lawsuit: (1) disability discrimination in violation of the Americans with Disabilities Act ("ADA") 42 U.S.C. § 12101, et seq., and Ohio Rev. Code § 4112.02; (2) wrongful termination in violation of public policy; (3) retaliation in violation of the FMLA, 29 U.S.C. § 2601, et seq.; and (4) intentional infliction of emotional distress. The Court addresses each of these claims in turn below.

A. **Disability Discrimination**

When considering claims for disability discrimination, Ohio law generally applies the same analysis that applies under the ADA. *Jakubowski v. Christ Hospital, Inc.*, 627 F.3d 195, 201 (6th Cir. 2010). Ohio courts therefore "look to regulations and cases interpreting the [ADA] for guidance in [their] interpretation of Ohio law." *City of Columbus Civil Service Commission v. McGlone*, 82 Ohio St. 3d 569, 573, 697 N.E.2d 204 (1998). Here, the parties acknowledge this fact by analyzing Bates's disability discrimination claim exclusively under the ADA standard. Accordingly, the Court does the same.

Bates does not claim to have direct evidence of disability discrimination. Her claims are therefore subject to the *McDonnell Douglas* burden-shifting framework. Under that framework, Bates first must establish a prima facie case of discrimination. The elements of a prima facie claim are that (1) she was "disabled" within the meaning of the ADA; (2) she was otherwise qualified to perform the essential functions of her job; (3) she suffered an adverse employment action; and (4) a non-disabled person

replaced her. *Martin v. Barnesville Exempted Vill. Sch. Dist. Bd. of Educ.*, 209 F.3d 931, 934 (6th Cir. 2000) (citation omitted); *see also* 14 Ohio Jur. 3d Civil Rights § 51, citing, *inter alia*, *Witte v. Rippe & Kingston Systems, Inc.*, 358 F. Supp. 2d 658 (S.D. Ohio 2005); *Brown v. BKW Drywall Supply, Inc.*, 305 F. Supp. 2d 814 (S.D. Ohio 2004).

Once a prima facie case has been established, the burden shifts to Anthem to "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* Finally, the burden shifts back to Bates to demonstrate that Anthem's stated reason for her termination is a pretext for unlawful discrimination. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

### 1. Whether Bates Can Establish a Prima Facie Claim

Anthem argues that Bates cannot establish a prima facie claim of disability discrimination for two reasons. First, it contends that Bates cannot prove she was disabled or perceived to be disabled. Second, it contends that Bates has not shown that she was replaced by a non-disabled person.

As to its first argument, Anthem notes that Bates's alleged disabilities were the result of scheduled, elective surgeries. The temporary conditions resulting from these surgeries, contends Anthem, are not disabilities under the ADA. (Doc. 16 at 10-11, citing *Lee v. Spectranetrics Corp.*, No. 12-cv-633, 2013 U.S. Dist. LEXIS 139232 (D. Colo. Sept. 27, 2013) (granting summary judgment for defendant on ADA claim where plaintiff was able to return to work following shoulder surgery and perform the essential functions of his job without accommodation); *Acosta v. Hilton Grand Vacations Co.*, C.A. No. 4:15-495, 2017 U.S. Dist. LEXIS 49494 (D.S.C. Jan. 23, 2017) (plaintiff who

11

underwent breast reduction surgery was not a qualified individual with a disability), *R&R adopted by* 2017 U.S. Dist. LEXIS 47359 (D.S.C. Mar. 30, 2017); *Roberts v. Onslow Cty. Bd. of Educ.*, No. 7:13-cv-39, 2014 U.S. Dist. LEXIS 157859, at *16 (E.D.N.C. Aug. 28, 2014) (finding no disability when procedure was not medically necessary and no substantial limitations post-surgery).)

The term "disability" is defined as:

(A)   a physical or mental impairment that substantially limits one or more major life activities;

(B)   a record of such impairment; or

(C)   being regarded as having such an impairment […].

42 U.S.C. § 12102(1); *see also* Ohio Rev. Code § 4112.01(A)(13) (defining disability as "physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment").

In her response, Bates asserts that she suffered from depression and ongoing problems with her back, both of which constituted disabilities. (Doc. 18 at 5.)[1] (She does not claim that any conditions arising from her tummy tuck surgery constituted a disability.) Bates's depression was a disability, she alleges, because it substantially

---

[1] The Court notes that Bates cites to her own deposition testimony in support of these assertions but failed to attach the corresponding portions of her deposition transcript to her memorandum. As a result, there is no admissible evidence in the record supporting the contention that she was disabled due to her depression and back pain. In the interest of justice, however, the Court has considered her arguments despite this failure.

12

limited her sleep. The bulging disc in her back caused her to have leg pain for close to a year before she had surgery in May 2017. Bates contends that a reasonable juror could infer that this pain significantly limited her ability to walk, sit, concentrate and/or work.

Anthem responds that Bates never claimed that her depression constituted a disability at deposition. Rather, she only referenced depression in response to a question about emotional distress damages. (Doc. 16-2 at 164:4-11.) Moreover, Anthem argues that there is no evidence that Parcell, her supervisor, knew or perceived that Bates had depression. Anthem similarly contends that there is no evidence that Parcell knew that Bates's back impaired her ability to engage in any major life activity.

Anthem is correct that "an employee cannot be considered to have been fired 'on the basis of disability' unless the individual decision-maker who fired the individual had knowledge of that disability." *Nilles v. Givaudan Flavors Corp.*, 521 F. App'x 364, 368 (6th Cir. 2013), citing, *inter alia*, *Burns v. City of Columbus, Dep't of Pub. Safety, Div. of Police*, 91 F.3d 836, 844 (6th Cir.1996) (holding that plaintiff could not establish a prima facie case of disability discrimination because he had failed to show that the members of a review board that made the ultimate decision to terminate him knew of his disability); *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1181–82 (6th Cir.1993) (holding that because "it was the Board of Directors, and not the president, who suspended plaintiff," plaintiff could not state a claim of disability discrimination where "[t]here is no showing that the Board had any knowledge of plaintiff's mental illness"). However, this caselaw stands for the proposition that a plaintiff cannot show causation absent

13

such knowledge. It does not address whether or not the plaintiff actually suffered from a disability as defined in the ADA.

Regardless, even accepting Bates's contention that a reasonable juror could find that she suffered from a disability, such a juror could not find that Parcell had any knowledge of her alleged disabilities. Bates argues that Parcell knew that she had taken FMLA leave twice in the year before her termination and had also requested a reduced schedule to accommodate her recovery. Therefore, she reasons, Parcell knew that Bates had an ongoing condition that limited her ability to work.

Knowledge that an employee requires leave and a temporary adjustment of her schedule is not the same as knowing that the employee is disabled. Nor does it support a reasonable inference that Bates's supervisor knew she was disabled. Parcell did not talk to Bates about the reasons she was taking FMLA leave, was not informed by anyone else at Anthem about the basis for her leave, never saw her leave paperwork, and was not involved in reviewing the FMLA request or certification. (Doc. 16-1 at 24:22-25, 49:15-17, 137-46.) There is no evidence creating a genuine issue regarding Parcell's testimony that, at the time of Bates's termination, he did not perceive her as having any limitations. (*Id*. at 137-146.) As Bates fails to cite any evidence showing that the decisionmaker responsible for her termination knew that she was disabled, her claims for disability discrimination must be dismissed.

Bates also fails to show that she was replaced by a non-disabled person or that her position remained open while Anthem sought other applicants. *See Walsh v. United Parcel Serv.*, 201 F.3d 718, 725 (6th Cir. 2000) (setting standard for a discriminatory

14

termination claim). The Behavioral Health Services department was restructured in October 2017, and no one was hired to replace Plaintiff. (Doc. 16-1 at 22.) There is also no evidence that Bates's position remained open while Anthem sought other applicants. *See Mattingly v. Henderson Cty. Healthcare Corp.-Two*, No. 4:16-CV-00021-JHM, 2018 U.S. Dist. LEXIS 3416, at *10 (W.D. Ky. Jan. 8, 2018) (holding plaintiff failed to establish a prima facie case when defendant neither replaced plaintiff nor held her position open while her replacement was sought); *Fleming v. Honda of Am. Mfg.*, 2017 U.S. Dist. LEXIS 161578, 2017 WL 4296314, at *3 (S.D. Ohio Sept. 28, 2017)("It is settled law in the Sixth Circuit that '[s]preading the former duties of a terminated employee among the remaining employees does not constitute replacement.'"). For this reason too, Bates cannot establish a prima facie case and her disability discrimination claims must be dismissed.

### 2. Whether Bates Can Show Pretext

Bates's disability discrimination claims also must be dismissed because she cannot show pretext. Bates argues that Anthem's proffered nondiscriminatory reason for terminating her employment—that she was engaging in call avoidance—had no basis in fact and was insufficient to motivate the employer's action. The assertion that Bates was not in fact engaging in call avoidance is unsupported by the record. She claims that she was trying to transfer calls to customer service because she could not resolve them herself. Due to an incorrect phone list (provided by Anthem), she inadvertently transferred the calls back into the queue. This explanation, however, only explains a portion of the 26 calls that were transferred to other UMRs. In addition, there

is no evidence disputing the fact that the other UMRs were able to handle the transferred calls and write up a case. As a result, Bates's claim that the calls required customer service, not a UMR, is contradicted by undisputed facts in the record.

Bates also has not shown a genuine issue regarding whether call avoidance was sufficient to warrant her termination. The Sixth Circuit and this Court have found that violation of company policy is a legitimate, nondiscriminatory reason for termination. *See*, *e.g.*, *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 558 (6th Cir. 2009) (affirming summary judgment for employer where articulated reason for termination was employee's violation of code of conduct); *Green v. Schaeffer's Inv. Research, Inc.*, No. 1:09-CV-360-HJW, 2012 WL 667951, at *11 (S.D. Ohio Feb. 29, 2012) (granting summary judgment to employer where articulated reason for termination was violation of e-mail and confidentiality policies). The inability to create a genuine issue as to pretext also warrants dismissal of Bates's age discrimination claims.

### 3. Allegations that Anthem Failed to Accommodate Bates

Bates also suggests in her memorandum that Anthem failed to accommodate her disabilities. This claim is raised in the Complaint (*see* Doc. 1 at ¶ 46, 57) but there are no facts asserted on summary judgment to support it. At deposition, Bates testified that Anthem granted both of her requests for working half days when she returned from FMLA leave. Her claim for failure to accommodate therefore appears to be premised on her allegation that Parcell was hostile toward her requests to work half days. Parcell disputed this allegation at his deposition, testifying that he was not hostile but simply did not have the authority to grant the requests. Human Resources had to make that

decision. Regardless of this factual dispute, Bates does not cite any authority for the proposition that she can bring a claim against an employer that granted her requests for accommodation. Accordingly, this claim must also be dismissed.

### B. FMLA Retaliation

Bates's FMLA retaliation claim is also subject to the *McDonnell Douglas* burden-shifting framework. Thus, to establish a prima facie case, she must show: (1) she availed herself of a protected right under the FMLA; (2) she suffered an adverse employment action; and (3) there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action. *Marshall v. Rawlings Co., LLC*, 854 F.3d 368, 381 (6th Cir. 2017). If Bates makes this showing, the burden shifts to Anthem to articulate a legitimate, nonretaliatory reason for the adverse employment action. *Id.* at 382. Bates then must show that Anthem's stated reason is pretextual. *See id*.

Putting aside whether Bates can establish a prima facie case, she argues that Anthem's stated reason for her termination is pretextual for the same reasons discussed with regard to her age discrimination claims. The Court has already determined that Bates failed to create a genuine issue of material fact based on those arguments. Consequently, her FMLA retaliation claim also must be dismissed.

### C. Wrongful Termination and Intentional Infliction of Emotional Distress

In its opening memorandum, Anthem argued that Bates's wrongful termination claim and claim for intentional infliction of emotional distress also fail as a matter of law. As to the former, Anthem noted that the Supreme Court of Ohio has held that

17

there is "no need to recognize a common law action for wrongful discharge if there already exists a statutory remedy that adequately protects society's interests." (Doc. 16 at 16, quoting *Slane v. MetaMateria Partners, LLC*, 892 N.E.2d 498, 504 (Ohio Ct. App. 2008).) Here, Anthem contends that the federal and state statutes prohibiting disability discrimination adequately protect societal interests, thereby rendering the wrongful termination claim superfluous. Bates does not address this argument in her opposition and appears to have abandoned the claim. It is therefore dismissed.

Anthem argues that the intentional infliction of emotional distress claim fails because Bates failed to produce any evidence of the type of "extreme and outrageous" conduct required to establish a claim. The elements that Bates would have to prove are: (1) Anthem intended to cause emotional distress, or knew or should have known that actions taken would result in serious emotional distress; (2) Anthem's conduct was extreme and outrageous; (3) Anthem's actions proximately caused Bates's psychic injury; and (4) the mental anguish Bates suffered was serious. *Hanly v. Riverside Methodist Hosp.*, 603 N.E.2d 1126, 1132 (Ohio Ct. App. 1991). Again, Bates does not address this claim in her opposition. Moreover, the Court agrees that she has not come forward with evidence of conduct that could meet the requisite standard. *See, e.g., Wissler v. Ohio Dep't of Job & Family Servs.*, 2009-Ohio-2826, at ¶ 38 ("The act of terminating employment falls short of the extreme or outrageous conduct necessary to support a claim for intentional infliction of emotional distress."). For both these reasons, the claim is dismissed.

## CONCLUSION

For the reasons above, the Court **GRANTS** Anthem's Motion for Summary Judgment (Doc. 16). This case shall be **TERMINATED** on the Court's docket.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____
JUDGE MATTHEW W. McFARLAND
